## Clift v. Harp.

(Decided April 26, 1921.)

### Appeal from Fayette Circuit Court.

1. Brokers—Employment and Authority—Implied Contract—Compensation.—When a landowner who desires to sell his farm requests a real estate dealer to find or bring him a purchaser for his farm and the real estate dealer finds a buyer and takes him to the landowner and suggests the trade, the law raises an implied contract by which the seller, if the sale is made, must pay the dealer who found the purchaser and brought about the trade, a fair and reasonable compensation, even though there was no mention made between the parties as to compensation or commission.

2. Brokers—Commissions—Presumptions.—If there is an established rate of commission for the sale of like real estate in that vicinity this will be presumed to have been in the minds of the parties in the absence of a contrary showing and the dealer may have judgment for the amount of such commissions on the sale price.

A. B. THOMASON for appellant.

W. C. G. HOBBS, for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

Harp lived in Lexington and was trading in real estate in 1917. Clift owned a farm partly in Bourbon and partly in Fayette counties, of 135 acres which he wanted to sell at $150 per acre and asked Harp to find or bring him a buyer. Harp told Clift he could furnish a buyer.

Some weeks later Harp learned that one Hampton wanted to buy a farm of the size and nature of the one owned by Clift, and Harp told Hampton about the farm and offered to take Hampton to see it. They set a day on which to go and both Hampton and his father went with Harp to see the Clift farm. They found Clift on the farm at work and Harp introduced the two Hamptons to Clift and told Clift that the Hamptons wanted to buy a farm and had come to look at Clift's farm. Clift was anxious to sell and took the Hamptons over the farm and showed it to them. Harp waited at the house and took the Hamptons home that evening. The prospective purchasers were pleased with the farm, and in a few days went a second time with Harp to see the Clift farm.

In the meantime they had asked Harp to find out if the land could be purchased at less than $150 per acre and Harp called Clift over the phone and made the inquiry but received a negative answer. Soon thereafter Hampton bought the farm from Clift at the price named, and Harp, who had brought about the sale and purchase, claimed a commission of 3 per cent. on the amount of the sale price for his services, but Clift refused to pay the same or any part thereof, and Harp brought this action against Clift to recover $600, averring that amount due him, being 3 per cent. of the sale price. A jury trial was had, resulting in a verdict and judgment for the whole amount prayed. Clift appeals.

As grounds for reversal of the judgment Clift insists that as he was entitled to a peremptory instruction at the close of the plaintiff's evidence because it failed to show

that he had employed or engaged Harp as his agent or otherwise to sell or offer for sale the farm which was sold, and the evidence did not show that Clift had agreed or promised to pay Harp for his services in such sale or for any services, his motion for a directed verdict in his favor was erroneously overruled by the trial court.

The evidence of plaintiff on this point is as follows:

"I knew an oil man here, Eastin, who was here and his wife was here and they were leasing oil lands and I was telling about a flow of gas at Hutchinson Station, there close to Mr. Clift's and what a flow of gas they had there, and he said, can't you take me out there, that he wanted to see the flow of gas, and he said, 'Are you acquainted out here?' and I said, 'I know everybody out here,' and he said, 'I will give you $10.00 a day if you will come and take up some leases for me,' and we went there to lease Mr. Clift's land—we leased about 5,000 acres and that was one of the places I took him, and we told him Mr. Eastin wanted to lease his land, and he said, 'Alright, I will lease it,' and as we were going to the house to sign up the lease, as we were going to the house I said, 'Your wife said you wanted to sell your farm,' and he said, 'Yes,' and I said, 'I can find you a buyer.' And I said, 'What do you want for it?' and he said, '$150 an acre,' and I said, 'All right, I can sell it, I have sold two farms in this neighborhood,' and he said, 'Have you got me a buyer?' and I said, 'Yes, I will get you a buyer,' and we went to the house and signed the oil lease, and two or three weeks after that, at the Lexington Fair here, Mr. Hampton there came to me and said his son, Tyler, had sold his farm and asked me if I knew of a farm for sale, and I said, 'How much of a farm do you want?' and he said, 'One hundred and twenty-five to one hundred and fifty acres,' and I said, 'There is a farm down here at the edge of Fayette and Bourbon county I think will suit you,' and I said, 'What day will it suit you to go and see it?' and he said, 'Wednesday,' and on Wednesday I met him and we went down to this farm, me and him and Tyler, and went up the pike about a mile and a half and found Mr. Clift out on his farm, and we went out there and found him and I introduced him, and said, 'Here are two men that want to look at your farm, they want to buy a good farm, and I would like for you to show it to them, and he said, 'All right,' and we went there from that on until dark that evening looking at the farm, and I re-

member we caught the 8 o'clock car, I think, to Lexington, and we came back and went to the Phoenix Hotel and Mr. Tyler Hampton says to me, 'Ask Mr. Clift if that is the lowest price he will take for his farm, $150, an acre,' and I called him up over the phone and asked him if that was the lowest he would take for the farm and he said, 'Yes,' and I said, 'All right, I am sure they are pleased with the farm,' and I says, 'We will come back again about Friday noon and look again,' and which we did, and went out and stayed until about 9 o'clock that night and come to town and Mr. Clift came here the following Saturday and made the deal.''

Nothing whatever was said between Harp and Clift as to commission for the sale until after an agreement had been reached between Clift the seller, and Hampton the buyer, when Harp asked Clift about his commission, to which Clift said, ''How much do you want?'' and being informed by Harp that he wanted and expected 3 per cent. declined to pay the same. There was, therefore, no express contract between Clift and Harp by which Harp was employed to sell the farm and by which Harp was to receive compensation for his services, but where services are rendered by one not bound to render them at the request of another under such circumstances as that a reasonable person would have expected to pay therefor, the law will imply a promise to pay a reasonable sum for such services by the person who requested and received the same and the benefits thereof to the one who performs the services. (3 Page on Contracts 2466). In the case of Jones v. Moore, 13 R. 603, 99 S. W. 287, we said:

''As a matter of law, if the fact was that the defendant had requested and employed the plaintiff as broker to sell a part or all of the output of defendant's distillery, and that by plaintiff's efforts the defendant and the Goodhart-Hartman Company were brought together, resulting in said sale, a promise on the part of the defendant to pay plaintiff a reasonable compensation for his services is implied. The implied promise is as efficacious as an express one.''

When the broker or agent brought the seller and buyer together, introduced them and suggested the trade and the deal was in pursuance thereof consummated he is the efficient, procuring and contributing cause of the sale and is entitled to his commission if he performed the services at the request of the seller and they were such as one

would ordinarily expect to pay for, and this is true even though no reference is made to compensation or commissions by either seller or broker, for the law implies a promise on the part of the seller to pay the broker a reasonable compensation for the services performed, their extent and nature considered.

If there be a fixed and definite commission or compensation for such services in that vicinity and this is generally known and understood among such persons, in the absence of a specific agreement the customary commission will be presumed to have been in the minds of the parties and may, if reasonable, be held to be a part of the implied contract. In this case the usual commission for the sale of such lands is shown by the plaintiff to have been 3 per cent. and there is no contrariety of evidence on this point.

The jury concluded from the evidence that the conversation which is recited in the testimony of plaintiff, Harp, took place between him and Clift and that it amounted to a request on the part of Clift to Harp to find and bring Clift a purchaser for his farm and that in pursuance of this request Harp did do so, and the farm was sold at the price named. These facts were sufficient to raise an implied promise on the part of Clift to pay Harp a reasonable and fair compensation for his services and the trial court did not err in so holding.

Judgment affirmed.